CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED for RJK

AUG 13 2013

JULIA C. DUDLEY, CLERK
BY: HMcDonald
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| DAVID ALLEN DEAN, ) | Civil Action No. 7:13-cv-00115 | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | MEMORANDUM OPINION | |
| ) | | |
| SOUTHWEST VIRGINIA REGIONAL ) | | |
| JAIL AUTHORITY, et al., ) | By: Hon. Jackson L. Kiser | |
| Defendants. ) | Senior United States District Judge | |

David Allen Dean, a Virginia inmate proceeding pro se, filed a civil rights action pursuant to 42 U.S.C. § 1983, naming as defendants the Southwest Virginia Regional Jail Authority, Major George Hembree, and Officer Clark Pauley. Plaintiff alleges that Officer Pauley was deliberately indifferent to an inmate's attack with a mixture of bleach and urine on Plaintiff, in violation of the Eighth Amendment to the United States Constitution, and that the other Defendants are responsible for Officer Pauley's acts and omissions. Defendants filed a motion for summary judgment, and Plaintiff responded, making the matter ripe for disposition. After reviewing the record, I grant Defendants' motion for summary judgment because Plaintiff failed to exhaust available administrative remedies.

I.

The record reveals the following facts when viewed in a light most favorable to Plaintiff. While incarcerated in 2009 at the Southwest Virginia Regional Jail in Duffield, Virginia ("Jail"), Plaintiff helped secure the conviction of a twenty-one year old man for soliciting murder of a state circuit judge. Plaintiff's involvement with the prosecution became known at the Jail, and Plaintiff was moved to segregation for his own protection before being released from custody.

Plaintiff was incarcerated again at the Jail in April 2011. Inmates still remembered Plaintiff's involvement with the prosecution, and they continued to threaten him, harass him, and throw liquids on him.[1] One particular inmate named Anderson constantly cursed Plaintiff and his family, shouted obscenities at him, and threatened to physically harm him. Consequently, Major Hembree ordered Plaintiff to be placed back in the segregation pod for protection from "almost every inmate in the jail [who] wanted to do something to him." At some time around December 2011, Anderson was moved from the general population pod to the segregation pod, where he renewed constant verbal tirades about Plaintiff and his family.[2] A "keep-away order" was imposed to keep Plaintiff and Anderson separated once Anderson arrived in the segregation pod.

Officer Pauley frequently worked the segregation pod where Plaintiff and Anderson were housed and resented Plaintiff because Officer Pauley knew the convicted man all his life. Officer Pauley would curse and degrade Plaintiff in the presence of other inmates, often saying something like, "I would beat your ass for what you did to that boy if I could get away with it." Officer Pauley favored Anderson and laughed any time he let Anderson loiter at Plaintiff's cell door to curse and shout at Plaintiff. Plaintiff complained about Officer Pauley to the shift supervisor, who ordered Officer Pauley to not let Anderson curse and threaten Plaintiff.

On February 18, 2012, Officer Pauley allowed Anderson to use the pod's caged shower. When done showering, Officer Pauley freed Anderson from the shower, and Anderson walked to Plaintiff's cell, repeatedly cursed Plaintiff, and placed a shampoo bottle in the gap under

---

[1] These interactions occurred when staff made all inmates from the segregation pod, including Plaintiff, spend their two hours of recreation in a general population pod while the inmates housed there were locked in their cells. (ECF no. 37 at 3.) The general population inmates would then throw water, urine, and spoiled milk on Plaintiff and shout that they would pay another inmate to inflict physical harm on Plaintiff.

[2] The segregation pod served as both a protective custody unit and a disciplinary unit.

Plaintiff's cell door. Plaintiff tried to cover up the gap because he knew inmates often use the bottles to spray urine, feces, or spoiled milk inside a cell, but before he could do so, Anderson stomped on the bottle and sprayed Plaintiff's face and left-eye with a mixture of urine and bleach.[3] Plaintiff looked through a crack in the tray slot and saw Officer Pauley standing near the shower, laughing and clapping his hands before he and Anderson gave each other a "high-five sign" to celebrate Anderson's attack.

Officer Pauley was still laughing about the attack when he locked Anderson in his cell and approached Plaintiff's cell. Plaintiff asked Officer Pauley to get a nurse to check his face and eye; clean clothes; and cleaning supplies for his cell. Officer Pauley said he would not do anything, Plaintiff replied that he would report Officer Pauley for the attack, and Officer Pauley said that Plaintiff would be gone before having the chance to do anything.[4]

Jail staff permitted all inmates to use a computer kiosk in the general population pod to, inter alia, access and file grievances and requests for services. Although Plaintiff could use the kiosk only when he was in the general population pod, the general population inmates had access to it whenever they were not locked in their cells. These inmates would enter Plaintiff's identification number and scan their fingerprints to try to log into Plaintiff's account, which caused multiple authentication errors that automatically made Plaintiff's account inaccessible for twenty-four hours.[5]

Plaintiff could not physically access the kiosk on Saturday night when the attack happened, and he was locked out of his account when he tried to use the kiosk on Sunday,

---

[3] Plaintiff speculates that Officer Pauley gave Anderson the bleach before going to the shower.
[4] Approximately fifteen minutes later, another officer brought Plaintiff clean clothes and cleaning supplies, and a nurse examined Plaintiff's eye and said he could see the Jail's doctor.
[5] Plaintiff alleges that "the entire staff[,] from the Major on down[,]" knew about general population inmates locking him out of his own account due to his repeated complaints.

February 19, 2012. On Wednesday, February 22, 2012, Plaintiff was transferred from the Jail before filing a formal grievance about the attack and before the Jail's doctor could examine him.[6] Plaintiff requests $500,000 in damages for the permanent damage to his left eye, deteriorating eye sight since the attack, and mental anguish.

## II.

Defendants filed a motion for summary judgment, arguing that the limitations period expired, plaintiff failed to exhaust administrative remedies, and that the Authority is entitled to sovereign immunity. A party is entitled to summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); see Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (recognizing a party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant). "Material facts" are those facts necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific, admissible facts that demonstrate the existence of a genuine issue of fact for trial. Id. at 322-23. A court may not resolve disputed facts, weigh the evidence, or make determinations of

---

[6] Notably, Plaintiff arrived at his subsequent correctional facility, the Virginia Department of Corrections' ("VDOC") Powhatan Correctional Center ("Powhatan") on the same day.

4

credibility. Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995); Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). A court accepts as true the evidence of the non-moving party and resolves all internal conflicts and inferences in the non-moving party's favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).

A. PLAINTIFF'S ACTION DOES NOT VIOLATE THE STATUTE OF LIMITATIONS.

Defendants first argue that Plaintiff filed this action beyond the statute of limitations set forth in Virginia Code § 8.01-243.2, which limits actions filed by persons confined in a state or local correctional facility to the later of within one year of when the action accrued or six months after exhausting all available administrative remedies. A civil action filed pursuant to 42 U.S.C. § 1983 adopts the statute of limitations that the forum state uses for general personal injury cases. Owens v. Okure, 488 U.S. 235, 249-50 (1989). Virginia Code § 8.01-243(A) is the state statute of limitations for general personal injury actions. Accordingly, the two year limitations period set forth in Virginia Code § 8.01-243(A) is the appropriate time limit for this § 1983 action. See Shelton v. Angelone, 148 F. Supp. 2d 670, 677 (W.D. Va. 2001) (Turk, J.) (holding that Virginia Code § 8.01-243(A) is the applicable statute of limitations for a prisoner's civil rights action filed pursuant to 42 U.S.C. § 1983, not Virginia Code § 8.01-243.2); Billups v. Carter, 268 Va. 701, 710, 604 S.E.2d 414, 419 (2004) (recognizing that the applicable limitations period for a prisoner's civil rights action filed pursuant to 42 U.S.C. § 1983 is two years under Virginia Code § 8.01-243(A) and not the limitations period applied to state prisoner actions under Virginia Code § 8.01-243.2).

Assuming Plaintiff's action accrued on February 18, 2012, when Officer Pauley allegedly let Anderson attack Plaintiff, the action is timely filed within the two-year limitations period. See Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S.

192, 201 (1997) (stating a federal cause of action accrues when a Plaintiff has a complete and present cause of action or when a Plaintiff can file suit and obtain relief); Cox v. Stanton, 529 F.2d 47, 50 (4th Cir. 1975) (recognizing federal law governs the question of when a cause of action accrues). Accordingly, Defendants are not entitled to summary judgment based on the applicable two-year statute of limitations.

B. PLAINTIFF FAILED TO EXHAUST AVAILABLE ADMINISTRATIVE REMEDIES.

Defendants also argue that Plaintiff failed to exhaust the Jail's administrative remedies. The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust all available administrative remedies before filing a claim pursuant to 42 U.S.C. § 1983. 42 U.S.C. § 1997e(a); see Woodford v. Ngo, 548 U.S. 81, 85 (2006) (stating that "[e]xhaustion is no longer left to the discretion of the district court, but is mandatory"); Porter v. Nussle, 534 U.S. 516, 532 (2002) (stating that the PLRA applies to "all inmate suits, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong"); Booth v. Churner, 532 U.S. 731, 739 (2001) (finding that the PLRA requires administrative exhaustion prior to the filing of a federal civil rights suit even if the form of relief the prisoner seeks is not available through exhaustion of administrative remedies). Thus, prisoners must not just initiate timely grievances but must also timely appeal any denial of relief through all levels of available administrative review. See Woodford, 548 U.S. at 93 (holding that the PLRA requires "proper exhaustion" of institutional administrative remedies before filing any federal suit challenging prison conditions). To properly exhaust a claim, a prisoner must file grievances with sufficient detail to alert prison officials of the possible constitutional claims that are now alleged as a basis for relief. See Smith v. Rodriguez, No. 7:06-cv-00521, 2007 U.S. Dist. LEXIS 43571, 2007 WL 1768705 (W.D. Va. June 15, 2007) (citing McGee v. Fed. Bureau

6

of Prisons, 118 F. App'x 471, 476 (10th Cir. 2004)). An inmate's failure to exhaust is an affirmative defense that a defendant has the burden to prove. Jones v. Bock, 549 U.S. 199, 216 (2007).

Plaintiff generally argues that administrative remedies were not available to him. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008). "[W]hen prison officials prevent inmates from using the administrative process . . ., the process that exists on paper becomes unavailable in reality." Kaba v. Stepp, 458 F.3d 678, 684 (7th Cir. 2006). Whether a remedy was available depends on the applicable procedural rules. Woodford, 548 U.S. at 88; Moore, 517 F.3d at 725.

The Jail's grievance policy, Standard Operating Procedure 15.01 6VAC15-40-130 ("Policy"), "is intended to supplement, not replace, the informal channels of resolving conflicts and is intended to be utilized when all other channels have been exhausted." Policy § I. "Informal channels" means an inmate's "use of the Inmate Request/Complaint for Information form, Medical Request form, verbal assistance from the Housing Officer, or request for assistance from a supervisor." Id. § II.D. Although Plaintiff pursued informal channels of resolution about being locked out of the kiosk and Officer Pauley's intimidating and rude behavior, Plaintiff has not contradicted Defendants' evidence that he did not "informally" discuss the attack with staff, as required by Policy. Consequently, Plaintiff failed to comply with the most basic part of the Policy to simply communicate with Jail staff about Officer Pauley's reaction or inaction to Anderson's attack with the shampoo bottle.

Even if the informal channels were "exhausted," Plaintiff failed to file a grievance pursuant to the Policy. A grievance is "[a] complaint about any behavior or action directed

7

toward an inmate by another person, to include criminal acts, or violation of those rights not surrendered as a result of adjudication or confinement." Id. § II.B.2. An inmate "must file the grievance within [seven] days of the incident for complaint, except where there is a good reason for the delay. The delay should not exceed [fifteen] days." Id. § III.F.1. If the grievance is filed against a specific staff member, the Grievance Officer prepares a memo to the applicable supervisor or shift commander, directing that an investigation be conducted, and that supervisor or shift commander must make a written finding of the investigation within five days. Id. § III.B.1-2. Neither the inmate nor an employee involved in grievance may participate in any capacity in resolving the grievance. Id. § I. Although the inmate is not informed of the results of the investigation, the inmate will receive a written explanation of the Grievance Officer's adjudication within nine days of when the inmate filed the grievance. Id. § III.B.1.b.5. The grievance is returned to the inmate via outgoing mail, and the Shift Commander will ensure its delivery. Id. § III.C. Any question or suggestion about the Policy should be addressed to the Chief of Security.[7] Id. § IV.

Plaintiff first complains that sometimes he and other segregated inmates would not be allowed to go the general population pod where the kiosk is located because a pod would be flooded or a security risk existed. Plaintiff also complains that general population inmates would cause him to be locked out of his own account. Defendants provide a business record of a grievance Plaintiff allegedly filed via the kiosk after the attack, but Plaintiff believes the date of the grievance was forged because he allegedly filed that grievance before the attack. Nonetheless, Plaintiff was allowed seven days, and up to fifteen days with good reason, after the

---

[7] The Policy also explains the procedures for appealing adverse grievance decisions, but that discussion is not necessary because Plaintiff did not file any grievance from which to appeal.

8

attack to file a grievance. Thus, whether Plaintiff was unfairly locked out of the kiosk or general population pod for the first two days of the possible fifteen-day period does not address whether administrative remedies were available to Plaintiff once he left the Jail and arrived at the next correctional facility on February 22, 2012.[8]

While it is obvious that Plaintiff could no longer access the kiosk once he was transferred, nothing in the Policy states that the kiosk is the only means to receive or file a grievance form. The VDOC's policy permitted Plaintiff to receive and send mail once he arrived at Powhatan, and the Policy did not preclude Plaintiff from corresponding with Jail staff about the Policy or the attack. Cf. Carr v. Hazelwood, No. 7:07-cv-00001, 2008 U.S. Dist. LEXIS 81753, at *15-16, 2008 WL 4556607, at *5 (W.D. Va. Oct. 8, 2008) (Urbanski, Mag. J.) (recognizing that administrative remedies were unavailable to an inmate who was transferred from a county jail because that jail's grievance procedures prohibited sending grievances to any correctional facility where that inmate was transferred). Plaintiff complains that the Policy is invalid because it does not reflect the actual practice of using the kiosk as the means to access or file grievance forms, but Plaintiff offers nothing to support the insinuation that he could not obtain the relevant paper forms from staff. Furthermore, Plaintiff's assumption that Jail staff would have rejected a self-styled grievance form is insufficient to excuse Plaintiff's absolute failure to attempt the Jail's informal and formal administrative remedies.

---

[8] Similarly, the remaining time to pursue administrative remedies after the transfer obviates the need to analyze Plaintiff's argument that he would not have filed any grievances even if he was not transferred and could access his account because he was afraid of retribution from Officer Pauley. Nonetheless, this argument is unpersuasive because the Policy prohibits the involvement of the grieving inmate or employee involved in grievance, and Plaintiff was freed from Officer Pauley's possible retaliation once Plaintiff was transferred to Powhatan. See, e.g., Kaba, 458 F.3d at 686 ("[T]hreats or other intimidation by prison officials may well deter a prisoner of ordinary firmness from filing an internal grievance, but not an external one because the latter might avoid threatened retaliatory conduct from prison employees.") (quoting Hemphill v. New York, 380 F.3d 678, 688 (2d Cir. 2004) (internal quotation marks omitted)). Moreover, Plaintiff does not allege that security issues like flooded pods or lock downs occurred continually between the attack and his transfer and prevented him from accessing the kiosk.

Plaintiff was required to pursue available administrative remedies, even if the Jail had no power to decree relief or when doing so would be futile. Booth, 532 U.S. at 741 n.6. The Policy did not prohibit Plaintiff from pursuing remedies at the Jail while he was incarcerated at Powhatan, and Plaintiff did not attempt to use informal channels or formal grievances to report Officer Pauley's alleged deliberate indifference to Anderson's attack. Accordingly, Defendants establish that an administrative process was available to Plaintiff, Plaintiff fails to establish that he was prevented from accessing the process through no fault of his own, and Defendants are entitled to summary judgment.[9]

## III.

For the foregoing reasons, I grant Defendants' motion for summary judgment.[10]

The Clerk is directed to send copies of this Memorandum Opinion and the accompanying Order to Plaintiff and counsel of record for Defendants.

ENTER: This 13th day of August, 2013.

                                                                           Senior United States District Judge

---

[9] Because Plaintiff's failure to exhaust available administrative remedies is dispositive, I do not need to determine whether the Authority is entitled to sovereign immunity. Cf. VA. CODE § 53.1-95.7(11) (permitting jail authorities to sue and be sued in their own names); Kitchen v. Upshaw, 286 F.3d 179, 184 (4th Cir. 2002) ("We are of opinion that the Regional Jail Authority is not an arm of the State for purposes of Eleventh Amendment immunity.").

[10] Summary judgment is the appropriate final disposition of Plaintiff's claims because the time limit has expired for filing a grievance, and no good reason exists in the record to account for a delay of more than 500 days. See, e.g., Berry v. Kerik, 366 F.3d 85, 88 (2d Cir. 2004) (recognizing dismissal with prejudice may be appropriate where exhaustion was required but administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust).